**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**MATTHEW C. MAVAR and
JULIE D. MAVAR**                                                            **PLAINTIFFS**

**VS.**                                            Civil Action No. <u>1:25cv197 TBM-RPM</u>

**MISSISSIPPI GREEN OIL, LLC,
dba BE SIMPLY MARVELOUS, LLC,
THOMAS J. MOORE, III, CHARLES T. HILL,
NICHOLAS QUAVE and JOHN DOES 1-5**                       **DEFENDANTS**

## COMPLAINT

    Matthew C. Mavar and Julie D. Mavar ("Plaintiffs") hereby file this Complaint against Mississippi Green Oil, LLC, dba Be Simply Marvelous, LLC ("MGO"), Thomas J. Moore, III, Charles T. Hill, Nicholas Quave, and John Doe ("Defendants"), as follows:

## NATURE OF THE ACTION

    1.    This is an action for violations of the Racketeer Influenced and Corrupt Organizations Act, Securities and Exchange Commission related-laws, torts, and damages related to Plaintiffs' purchase of unregistered securities from Defendants in the amount of $400,000.00.

## PARTIES

    2.    Matthew C. Mavar is an adult resident of Harrison County, Mississippi.

    3.    Julie D. Mavar is an adult resident of Harrison County, Mississippi.

    4.    Mississippi Green Oil, LLC, is a limited liability company organized under the laws of the State of Mississippi, with its principal address located at 80 E Beach Blvd, Unit 7, Gulfport, Mississippi 39507.  MGO may be served through its registered agent, Charles T. Hill, at 80 E Beach Blvd, Unit 7, Gulfport, Mississippi 39507.

5.      Thomas J. Moore, III, is an adult resident of Harrison County, Mississippi.  Moore may be served at his residence at 10054 Fountain Avenue, D'Iberville, Mississippi 39540.

6.      Charles T. Hill is an adult resident of Harrison County, Mississippi.  Hill may be served at his residence at 80 E Beach Blvd, Unit 7, Gulfport, Mississippi 39507.

7.      Nicholas Quave is an adult resident of Harrison County, Mississippi.  Quave may be served at his residence at 3199 Quave Road, D'Iberville, Mississippi 39540.

8.      John Does 1-5 are individuals whose identities are unconfirmed, unknown, uncertain, or those unable to be joined to this action.

## JURISDICTION AND VENUE

9.      Jurisdiction in this lawsuit is proper in this Court under 28 U.S.C. § 1331 because it presents questions of federal law violations based on violations of the Securities and Exchange Act of 1934 and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

10.      Venue in this action is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND

### MGO Background

11.      MGO was organized and founded by Moore on December 30, 2020, purportedly to produce and sell medical marijuana in Mississippi.  But the company was from its founding a fraudulent scheme to extract investor funds through promises of financial reward without any intention of actual success.

12.      John Doe was also a founding member of MGO.

13.    Quave became involved with MGO as a leading member of Moore's development company, which provided extensive services to MGO and was paid with MGO investment funds.

14.    Upon information and belief, Hill joined MGO as a member in late 2022.  Hill was officially added to MGO as a member on August 8, 2024, in a Mississippi Secretary of State filing.

15.    Defendants comprise a racketeering enterprise centered around MGO as a corporate entity organized under the laws of Mississippi.  Though Defendants operate additional other corporate entities associated with MGO and its operations in order to plan, coordinate, conspire, and carry out their racketeering operations.

16.    Defendants sent and received mail through the United States Postal Service in furtherance of their fraudulent scheme MGO.

17.    Defendants used wireless communication devices obtained through and utilizing cellular and data services in interstate commerce in furtherance of their fraud.

18.    Defendants travelled interstate in furtherance of their fraud.

19.    Defendants sought significant outside financial investments to fund MGO.

20.    Defendants communicated materially false information to induce investments in MGO.

21.    Defendants intentionally misused and squandered investment funds.

22.    Defendants spent investor funds on expensive personal trucks, lavish meals, living expenses, luxury goods, and on casino gambling, out-of-state vacations and trips, among other things unrelated to the stated purpose of the funds.

23.    Defendants never intended to deliver on promises made to MGO investors.

24.    Moore initially served as the leader of the MGO enterprise.

25.    Moore directed John Doe to locate and enlist large investors to invest substantial monetary assets into MGO with promises of immediate returns, high profit margins, and little risk involved.

26.    John Doe readily complied and recruited significant investments from duped investors.

27.    Quave, a member of Moore's development company, assisted in this scheme and received tens of thousands of dollars of investor funds without performing an equivalent amount of work.  Quave knew that Defendants were defrauding MGO investors and continued to participate in the scheme.

28.    Hill joined the scheme knowing that investors had been defrauded, and he recruited significant additional investments from outside investors while relying on fraudulent and predatory tactics.  Hill lived in Miami, Florida, at certain times during the relevant time period, but he is now located in Mississippi.

29.    To induce investments in MGO, Defendants produced false valuation documents and forecasted financial reports, which in 2023 valued MGO as valued between $1,410,000.00 and $49,350,000.00 and predicted pretax net income in the amount of $76,984,118.00.

30.    Neither Moore nor Hill are licensed by the Securities and Exchange Commission ("SEC") to sell securities.

31.    Moore and Hill deceived several investors to invest in MGO, even though Defendants knew their investors would never receive the returns promised by them.

32.    Several investors have sued Defendants for similar allegations.

33.    On August 8, 2023, a default judgment for $300,409.82 was entered against Moore in *Bonheim v. Moore Companies, LLC*, No, 2:23-cv-00326-JTM-KWR (E.D. La. 2023), in which

the plaintiff, Lester Boihem, had transmitted funds to Defendants for use in MGO.  Boihem asserted similar allegations of fraud regarding his investments in MGO.

34.     On May 17, 2024, investors David M. Konits and Scott Shier sued MGO, Moore, and Hill for similar allegations of fraud.  *See Konits v. MGO*, No. 1:24-cv-2186-SDG (N.D. Ga. 2024).

35.     On November 21, 2024, investors Victoria Burnley sued MGO, Moore, and Hill for similar allegations of fraud.  *See Burnley v. MGO*, No. 3:24-cv-117-CDL (M.D. Ga. 2024).

36.     Upon information and belief, MGO settled the latter two lawsuits in favor of the deceived investors.

37.     Grievances by other investors caused the SEC to investigate Defendants' use of investor funds.

38.     Upon information and belief, the SEC investigation may result in a civil or administrative enforcement action brought by the SEC or criminal proceedings brought by the U.S. Department of Justice.

### <u>Scheme to Defraud Plaintiffs</u>

39.     Plaintiffs do not have a net worth in excess of $1,000,000.00.

40.     Plaintiffs are not accredited investors under 17 C.F.R. § 230.501(a).

41.     Plaintiffs had not indicated to Defendants that they were accredited investors.

42.     Defendants had no reason to believe and did not believe that Plaintiffs were accredited investors.

43.     Beginning in the summer of 2018, John Doe was Matthew Mavar's gym trainer.

44.     John Doe built up a rapport with Matthew Mavar and would occasionally drop in unannounced at the Mavar residence.

45. John Doe began bragging to Matthew Mavar about his involvement with MGO, which he claimed was a medical marijuana startup company that would generate significant profits.

46. John Doe told Matthew Mavar that Moore was leading the company and that Moore had built significant wealth in the casino construction business.

47. John Doe intended and attempted to induce Matthew Mavar to invest in MGO.

48. This continued for several months.

49. John Doe either knew or should have known that MGO was a fraudulent scheme and that he would benefit from the theft of investor funds.

50. On or around June 2021, John Doe brought Moore to the Mavar residence and introduced Moore to Matthew Mavar.

51. Moore told Matthew Mavar about MGO and bragged that it would generate significant profits.

52. Moore told Matthew Mavar that he would sell him equity in MGO.

53. Moore told Matthew Mavar that he was asking other investors for $500,000.00 in exchange for one percent (1%) equity ownership in MGO based on a true and correct valuation of MGO, but he would give Matthew Mavar that same amount of ownership for only $300,000.00.

54. Moore knew this information was false.

55. Defendants promised Matthew Mavar that he would receive significant distributable funds as dividends and other capital gain appreciation on his investment.

56. Defendants knew this information was false.

57. Matthew Mavar told Moore and John Doe that he wasn't prepared to invest in MGO at that time.

58.     In November 2021, the Mavars discussed their finances and determined that the Defendants' promises of significant financial rewards was sufficient cause to liquidate their mutual fund investments and invest in MGO.

59.     The Mavars sold their Vanguard mutual funds.

60.     The Mavars requested financial information from Defendants.

61.     Defendants provided a fraudulent prospectus that showed projected revenue as $64,813,000.00 and that expenses would be only $1,500,000.00, which would create significant profit for equity investors.

62.     The Mavars believed the prospectus and its financial projections to be true and accurate.

63.     The Mavars relied upon this fraudulent information based on the rapport John Doe and Moore had built with Matthew Mavar.

64.     Defendants knew these financial numbers and the prospectus to be false.

65.     Moore told the Mavars that these financial numbers were conservative and that he believed profits would be tens of millions of dollars higher.

66.     Matthew Mavar told Moore and John Doe that the Mavars were interested in investing $300,000.00 in MGO in exchange for a one percent (1%) equity ownership interest.

67.     On November 17, 2021, Matthew Mavar invested $300,000.00 in MGO in exchange for a one percent (1%) equity stake in MGO.

68.     On December 3, 2021, Matthew Mavar met with John Doe and Moore at a Waffle House in Biloxi, Mississippi, to sign their agreement and to transfer the investment funds.

69.     On December 3, 2021, Matthew Mavar issued a $300,000.00 cashier's check to Moore Companies, LLC, from a BancorpSouth (now Cadence Bank) account to a Trustmark

National Bank account at Defendants' urging.  Both banks are FDIC insured institutions, engaged in interstate commerce, and are members of the Federal Reserve System.

70.     Moore began to ignore communications from Matthew Mavar.

71.     Matthew Mavar repeatedly texted and called Moore to request status updates on his investment and on the promised dividends.

72.     Moore rarely replied and instead directed Matthew Mavar to contact John Doe.

73.     John Doe attempted to pacify Matthew Mavar with vague promises of financial returns and assertions that MGO was operating as expected.

74.     John Doe withheld the true nature of the fraudulent scheme from Matthew Mavar.

75.     Defendants misused the Mavars' investment funds for personal expenses other than the stated purpose of funding MGO as a startup medical marijuana producer.

76.     Defendants continued to conceal their fraudulent use of the Mavars' investment funds.

77.     In November and December 2023, Defendants offered to sell the Mavars an additional two percent (2%) equity ownership interest in MGO in exchange for $100,000.00.

78.     Matthew Mavar asked why this ownership interest was much less expensive than his initial investment.

79.     Moore fraudulently stated that federal laws prevented the CFO of MGO from owning the two percent (2%) equity stake and that MGO had to sell quickly the shares to someone else.

80.     The true reason was that Defendants were attempting to collect funds to settle other outstanding lawsuits against them alleging similar conduct related to fraud and securities violations

in the sale of purported shares of MGO.  Defendants never told the Mavars about the outstanding

default judgment or the other lawsuits against them.

81.    Moore promised that the Mavars would recover this investment in as little as a few

months based on revenues he asserted MGO was about to obtain.

82.    The Mavars reasonably relied on Defendants' fraudulent assertions.

83.    Moore knew this was false.  The other Defendants knew of this fraud and conspired

to assist in securing the investment based on the fraud.

84.    The Mavars placed a second mortgage on their residence to obtain the $100,000.00

in funds necessary to purchase the two percent (2%) equity ownership interest.

85.    On December 5, 2023, Matthew Mavar invested an additional $50,000.00 in MGO

in exchange for an additional one percent (1%) equity stake in MGO.

86.    On December 5, 2023, Julie Mavar invested $50,000.00 in MGO in exchange for a

one percent (1%) equity stake in MGO.

87.    On January 30, 2024, Plaintiffs wired $100,000.00 to MGO under this agreement.

88.    Plaintiffs wired the $100,000.00 from a Cadence Bank account.

89.    Defendants persisted in failing to provide the promised dividends to the Mavars.

90.    Defendants failed to send updated financial statements or K1s to the Mavars.

91.    Defendants failed to communicate with the Mavars.

92.    Defendants embezzled and otherwise misused the Mavars' investment funds for

purposes other than those promised by Defendants.

93.    Defendants maintained that they were legitimate businessmen, but they were

defrauding the Mavars and other investors.

94.     On or around April 2024, Julie Mavar was approached at a local coffee shop—Jacked Up in Biloxi, Mississippi—by Moore's brother and uncle, Mikey Moore and Lou Moore.

95.     At that coffee shop, Mikey and Lou warned Julie Mavar that Moore had run out of money and that she needed to get her money out of MGO immediately.  Moore had used their addresses to receive mail and Moore had received mail stating that he owed other investors and contractors money.  Individuals had stopped by their residences looking to collect on money owed to them by Moore.

96.     In April 2021, Matthew Mavar requested to meet with Moore regarding the return of his investment funds.

97.     Matthew Mavar further requested that Moore send him a copy of the signed version of his investment agreement.

98.     Moore ignored several of Matthew Mavar's communications.  Moore rarely responded and often claimed to be sick, on vacation, or otherwise out of town.

99.     Julie Mavar requested to see the growing operation warehouse in Prentiss, Mississippi.  Defendants had never invited the Mavars to see the facility.  Moore promised that they could tour the facility in two weeks.  Two weeks later, Moore purported to be out of town and unable to show the facility to the Mavars.  Moore never arranged to show the Mavars the facility.

100.     At one point, Moore agreed to meet with the Mavars but when they showed up to the appointment, Moore alleged he was in Phoenix, Arizona.

101.     The Mavars finally met with Moore in person on June 7, 2024.

102.     The Mavars requested that MGO repurchase their ownership interest in exchange for their investment funds.

103.    Moore agreed to return their investment funds in exchange for their ownership interest.  But Moore stated he would have to get his lawyers involved and he would be in touch to sign it away.

104.     Moore knew this false, and the Mavars reasonably relied on this false assertion of fact.

105.    After that meeting, Moore told the Mavars they would have to work with Hill to obtain their investment funds back.

106.    Hill told the Mavars that MGO did not have their investment funds.  Hill stated that all their investment funds had been spent and that all MGO resources were tied up into operations.  Hill stated that Moore had embezzled significant MGO funds and was therefore no longer involved in MGO operations or as a shareholder.  Hill further stated that the Mavars would soon receive significant dividends based on their investment.

107.    Hill knew that the Defendants had collectively stolen the Mavars' investment funds and that MGO would not produce dividends as he had promised.  Hill further knew that Moore was still a shareholder of MGO.

108.    Hill made these assertions to keep the Mavars from further investigating Defendants' fraud.

109.    The Mavars began to question whether Defendants had acted legitimately.

110.    The Mavars asked around the business community to better understand Defendants' business operations.

111.    On October 29, 2024, an investigator with the Miami regional office of the Security and Exchange Commission Office of Enforcement contacted Matthew Mavar to interview him about MGO's fraudulent actions.

112.    The investigator stated that their office had opened an investigation into Defendants and their securities violations.

113.    Matthew Mavar explained that he had been defrauded.

114.    Matthew Mavar has been in contact with the SEC regarding this case since that time.

115.    Defendants have persisted in their fraudulent Ponzi scheme, seeking to defraud other investors.

116.    John Doe later confessed to Julie Mavar that Moore had defrauded investors, including John Doe, and that MGO was a fraudulent enterprise.  John Doe stated that Moore had given him $9,000.00 and permitted him to keep his MGO company truck in exchange for John Doe's amicable exit from MGO.

117.    On January 22, 2025, Hill updated MGO investors via letter, stating that MGO had settled all outstanding grievances and lawsuits, spending eight months and $1,200,000.00 on those efforts, and $200,000.00 in additional air conditioning and $63,000.00 in additional humidification.

118.    In that letter, Hill projected that MGO would earn net revenue of $4,832,770.00 and experience operating expenses of approximately $786,730.00 in the fiscal year beginning June 1, 2025, and ending May 29, 2026.  For the fiscal year beginning June 5, 2026, and ending September 2, 2027, Hill projected net revenue of $9,112,500.00 and operating expenses of $2,173,500.00.

119.    These projections were false and based on false information.  Defendants intended to mislead their current investors and future investors with these false projections.

120.    On March 14, 2025, Hill sent another investor update letter, which acknowledged that investors had been promised that MGO had earned revenue and that distributable funds were

on the way, and that this was untrue. Hill further confessed that the vital medical marijuana processing permit had never been awarded to MGO and to his knowledge had not even been applied for. Thus, Hill stated, it was unlikely that financial documentation of past expenses or K-1 tax documents prior to 2025 would ever be made available to investors.

121. The Mavars never initially received investment updates because Defendants purportedly has misspelled their email addresses. John Doe occasionally forwarded investment updates to the Mavars upon their request.

122. Furthermore, Hill announced that MGO was rebranding and would be doing business as "Be Simply Marvelous, LLC."

123. Hill signed the letter as the COO (chief operations officer) of MGO.

124. An exhibit attached to the letter stated that Matthew Mavar owned 4.20% of MGO. No agreement ever assigned the Mavars more than three percent (3%) equity ownership. These numbers were issued to defraud investors.

125. The letter further listed as investors other defrauded investors who had sued Defendants for the return of their investment.

126. The letter also stated that Moore was the top shareholder, even though Hill had promised that Moore no longer held any equity in MGO.

127. In May 2025, Mikey and Lou Moore spoke again with Julie Mavar in the Jacked Up coffee shop in Biloxi, Mississippi. They warned Julie Mavar that Moore had moved out of his girlfriend's apartment and fled town. They further stated that MGO's growing operation warehouse in Prentiss, Mississippi, had been abandoned along with the house MGO had owned there, which they stated had been ransacked with the copper stripped from it.

128.    As a result of Defendants' unlawful actions, Plaintiffs have incurred losses of their $400,000.00 investment, anticipated capital gains, expenses to recover these funds, attorney's fees, court costs, and significant mental anguish, among other losses.

## COUNT I: RICO CONSPIRACY

### 18 USCA § 1962(d)

129.    Plaintiffs reincorporate herein by reference the allegations from paragraphs 1-128.

130.    Defendants conspired and agreed to facilitate racketeering activities and to commit predicate acts in support of their enterprise.

131.    This conspiracy is separate from and in addition to Defendants' commission of securities fraud.

132.    Defendants are persons, both natural born and corporate, under RICO.

133.    Defendants conspired to and engaged in a pattern of racketeering behavior.

134.    Defendants conspired to and engaged in predicate acts such as wire fraud, mail fraud, and interstate transportation of stolen property.

135.    Defendants conspired to and engaged in conduct that facilitated a fraudulent scheme that relied on the use of interstate communications in furtherance of the scheme in violation of 18 U.S.C. § 1343.

136.    Specifically, Moore, Hill, and John Doe conspired to facilitate a scheme whereby Plaintiffs would wire $400,000.00 through banks engaged in interstate commerce.

137.    Defendants conspired to induce Plaintiffs to enter into these contracts to cause Plaintiffs to wire funds, even though the funds would be used for expenses and efforts other than those claimed by Defendants.  Specifically, Defendants identified Plaintiffs as susceptible targets and planned to use false promises and financial statements to induce Plaintiffs to wire funds to

them and to prevent Plaintiffs from discovering their fraudulent intentions. These communications occurred in and around November 2021 through December 2023 through electronic means including text messaging, telephone calls, and other electronic communications.

138.    Defendants conspired to and engaged in conduct that facilitated a preconceived fraudulent scheme that relied on the mail for purposes of executing the fraudulent scheme in violation of 18 U.S.C. § 1341.

139.    Specifically, Defendants conspired to and used the mail to send correspondence to each other, investors, contractors, and others in furtherance of their fraudulent scheme. They conspired to and sent and received items in the mail that furthered their scheme, including bills, payments, equipment, correspondence, receipts, investor letters, and other items that helped make them appear as a legitimate enterprise.

140.    Defendants conspired to facilitate each other's part of the scheme and to use the mail to induce Plaintiffs into investing in their fraudulent business.

141.    Defendants conspired to facilitate and engaged in the interstate transportation of stolen property in violation of 18 U.S.C. § 2314.

142.    Defendants conspired to facilitate the transportation of stolen money from Mississippi to Florida to the benefit of Hill, who was living in Florida at certain times during the relevant time period.

143.    Defendants conspired to facilitate Hill's interstate receipt of funds that were believed by Plaintiffs to assist with MGO but were actually stolen by Defendants as a part of their fraudulent scheme.

144.    Defendants conspired to send regular payments of stolen funds from banks located in Mississippi to Hill in Florida.  This comprised a significant portion of the $400,000.00 stolen from Plaintiffs.

145.    Defendants knew that their facilitation of the conspiracy would result in stolen funds being sent out of state.

146.    Defendants conspired to and engaged in the facilitation of a pattern of racketeering activity.

147.    Defendants' predicate acts of wire fraud, mail fraud, and the interstate transfer of stolen goods constitute a pattern of racketeering activity and demonstrate a continued threat of racketeering.

148.    The three other lawsuits against Defendants demonstrate a significant and detailed pattern of racketeering.

149.    Those lawsuits also involved conspiracies and engagements in the facilitation of wire fraud, mail fraud, and interstate transportation of stolen goods based on similar acts of fraud against MGO investors.

150.    Those series of related predicate acts spanning several years plainly show a clear pattern of racketeering.

151.    Defendants constitute a RICO enterprise.

152.    Defendants are individuals who are either members of or have closely associated with MGO, which is a limited liability company created under the laws of the State of Mississippi.

153.    Defendants conspired to facilitate in close concert the goals of their enterprise, including the facilitation of fraud against Plaintiffs.

154.    Defendants conspired to and agreed to commit RICO offenses, namely the facilitation of fraud against Plaintiffs and others.  Defendants knew of and agreed to facilitate the commission of these RICO offenses.

155.    Defendants conspired that each would benefit from their fraudulent scheme. Moore, Hill, and John Doe are members of MGO and, therefore, would have ready access to all stolen funds to spend as they desire.  Quave was given lucrative contracts through which he could extract MGO funds, all while knowing their stolen nature.

156.    Defendants knew of the illicit nature of their scheme yet each chose to facilitate the scheme as it related to Plaintiffs.

157.    Defendants have conspired to violate RICO.

158.    Plaintiffs have been harmed in their property by their loss of $400,000.00 as a result of Defendants' fraudulent scheme and the facilitation of same.

159.    Civil RICO actions require treble damages, costs, and attorney's fees to be awarded to successful plaintiffs.

160.    Defendants are liable to Plaintiffs for $1,200,000.00 for their initial investment and an amount to be calculated based on their expected returns, capital gains, dividends, and other compensatory damages.

161.    Defendants are further liable to Plaintiffs for attorney's fees, costs, and other damages as deemed fit by the Court.

## COUNT II: FEDERAL SECURITIES FRAUD

### 15 U.S.C. § 77q and 17 C.F.R. § 240.10b-5

162.    Plaintiffs reincorporate herein by reference the allegations from paragraphs 1-161.

163.    Defendants defrauded Plaintiffs in the purported sale of unregistered securities and are liable under federal law.

164.    Defendants used electronic communications and the mail to promise to quickly return Plaintiffs' initial investments.

165.    Defendants used electronic communications to promise that they would pay significant dividends to Plaintiffs and that Plaintiffs would receive significant appreciation on their investment.

166.    Defendants knew this was false.

167.    Defendant used electronic communications to transmit knowingly false information to fraudulently deceive Plaintiffs regarding the proper valuation and financial success of MGO.

168.    Defendants sent and received mail through the United States Postal Service in furtherance of their fraud.

169.    Defendants knowingly made these false promises to Plaintiffs, which induced Plaintiffs to wire $400,000.00 to Defendants.

170.    Plaintiffs wired $400,000.00 to Defendants through banks that operate in interstate commerce.

171.    Defendants are liable to Plaintiffs for $400,000.00 for engaging in fraud in connection with the purchase and sale of unregistered securities.

## COUNT III: UNJUST ENRICHMENT

172.    Plaintiffs reincorporate herein by reference the allegations from paragraphs 1-171.

173.    After repeated efforts by Defendants, Plaintiffs agreed to invest in MGO.

174.    Plaintiffs wired MGO $300,000.00 on December 3, 2021, in exchange for one percent (1%) of MGO's ownership interest, which Defendants promised would pay significant dividends to Plaintiffs with little risk involved.

175.    Plaintiffs wired MGO an additional $100,000.00 on January 30, 2024, in exchange for an additional two percent (2%) of MGO's ownership interest.

176.    Those funds were sent to Defendants based on the promise that the capital dividends would provide full repayment of the amount within 30 days, among other significant dividends, and capital gains.

177.    To date, no portion of the $400,000.00 has been repaid.

178.    To date, no distributions or dividends have been paid by MGO to Plaintiffs.

179.    Defendants received $400,000.00 from Plaintiffs but have not provided anything of value in return.

180.    Defendants are in possession of these funds, which in good conscience and justice they cannot retain but must return to Plaintiffs.

181.    Defendants are liable to Plaintiffs for unjust enrichment in the amount of at least $400,000.00.

## COUNT IV: BREACH OF CONTRACT

182.    Plaintiffs reincorporate herein by reference the allegations from paragraphs 1-181.

183.    Plaintiffs have a valid and binding contract with Defendants under which they agreed to wire a total of $400,000.00 in funds to MGO for a three percent (3%) ownership interest in MGO, repayment of the initial investment, and significant dividends and other capital gains.

184.    Defendants agreed to use those funds to begin and operate a marijuana cultivation and production facility and to provide profits from those endeavors to Plaintiffs.

19

185.     Plaintiffs wired those funds as promised.

186.     Defendants spent those funds on things other than MGO.

187.     Defendants have not paid back Plaintiffs' initial investment funds.

188.     Defendants have never paid Plaintiffs a dividend or otherwise produced capital gains for Plaintiffs.

189.     Defendants have altogether failed to perform under their agreement with Plaintiffs.

190.     Plaintiffs have not breached the agreement.

191.     Defendants are liable to Plaintiffs for breach of contract in the amount of at least $400,000.00.

## COUNT V: VIOLATION OF SEC REGULATIONS

### 17 C.F.R. 240.10b-5 through 15 U.S.C. § 78j

192.     Plaintiffs reincorporate herein by reference the allegations from paragraphs 1-191.

193.     Defendants made false representations regarding MGO, projected revenues, the legitimate and unencumbered status of their company, and other material information, which they communicated with the intent that the Mavars would invest in MGO.

194.     Defendants knew these representations to be false, and they further knew that a default judgment was already in place against them.

195.     Plaintiffs are not accredited investors, and they do not have net worths of more than $1,000,000.00.

196.     Defendants did not issue a private placement memorandum for the sale of security interest in MGO.

197.     No exception under 17 C.F.R. § 230.500 *et seq.* applies.

198.    Based on repeated promises surrounding the viability of MGO and the likelihood of repayment of their initial investment, Plaintiffs decided to invest $300,000.00 in December 2021 and an additional $100,000.00 in November 2023.

199.    Thereafter, Defendants have met no obligations under the terms of the agreement between the parties.

200.    To date, no portion of the $400,000.00 has been repaid.

201.    To date, no distribution has been made by Defendants to Plaintiffs.

202.    Plaintiffs have lost at least $400,000.00 as a result of Defendants' knowing misrepresentations.

203.    Defendants are liable to Plaintiffs for violations of SEC regulations under 17 C.F.R. § 240.10b-5 by way of 15 U.S.C. § 78j in an amount to be determined at trial.

<u>**COUNT VI: FRAUDULENT MISREPRESENTATION**</u>

204.    Plaintiffs reincorporate herein by reference the allegations from paragraphs 1-203.

205.    Defendants made false representations regarding MGO, projected revenues, the legitimate and unencumbered status of their company, and other material information, which they communicated with the intent that the Mavars would invest in MGO.

206.    Defendants knew these misrepresentations to be false and material

207.    Defendants intended for these false and material misrepresentations to induce Plaintiffs to invest $400,000.00 in MGO.

208.    Plaintiffs were unaware of the false and fraudulent nature of Defendants' misrepresentations.

209.    Plaintiffs relied on the perceived truthfulness of Defendants' misrepresentations. Plaintiffs wired $300,000.00 to MGO in December 2021 and an additional $100,000.00 in January 2024

210.    Plaintiffs were privileged to rely on Defendants' misrepresentations.

211.    Plaintiffs were consequently and proximately injured in their reliance on Defendants' knowingly false and material misrepresentations.

212.    Furthermore, as it relates to the December 2023 investment, the Defendants further knew that a default judgment was already in place against them.

213.    Based on the repeated promises surrounding the viability of MGO and the likelihood of repayment of their initial investment, Plaintiffs decided to invest.

214.    Thereafter, Defendants have met none of the obligations under the terms of their agreements.

215.    To date, no portion of the $400,000.00 has been repaid.

216.    To date, no distribution has been made by MGO to Plaintiffs.

217.    Plaintiffs have lost at least $400,000.00 as a result of Defendants' knowing misrepresentations.

218.    Defendants are liable to Plaintiffs for fraud in an amount to be determined at trial.

## COUNT VII: CONSPIRACY TO COMMIT FRAUD

219.    Plaintiffs reincorporate herein by reference the allegations from paragraphs 1-218.

220.    Defendants made false representations regarding MGO, projected revenues, the legitimate and unencumbered status of their company, and other material information, which they communicated with the intent that the Mavars would invest in MGO

221.   Defendants conspired to use false representations to induce significant financial investments by Plaintiffs into a fraudulent entity.

222.   Defendants made these representations that they knew to be false.

223.   Furthermore, as it relates to the December 2023 investment, Defendants further knew that a default judgment was already in place against them.

224.   Based on the repeated promises surrounding the viability of MGO and the likelihood of their initial investment, Plaintiffs decided to invest.

225.   Plaintiffs wired $300,000.00 to MGO in December 2021 and an additional $100,000.00 in January 2024.

226.   Thereafter, Defendants have met no obligation under the terms of their agreements.

227.   To date, no portion of the $400,000.00 has been repaid.

228.   To date, no distribution has been made to Plaintiffs.

229.   Plaintiffs have lost at least $400,000.00 as a result of Defendants' knowing misrepresentations.

230.   Defendants acted together in their conspiracy to defraud Plaintiffs.

231.   Moore made false representations and promises in his capacity as the owner and leader of MGO, and in his individual capacity.

232.   Hill made false representations in his individual capacity and as a member and agent of MGO.

233.   Quave and John Doe assisted Defendants in furtherance of their fraudulent scheme to defraud investors.

234.   Defendants are liable to Plaintiffs for conspiracy to commit fraud in an amount to be determined at trial.

## COUNT VIII: BREACH OF CONTRACT

235.    Plaintiffs reincorporate herein by reference the allegations from paragraphs 1-234.

236.    On June 7, 2024, Matthew Mavar requested that MGO repurchase his equity ownership in exchange for his $400,000.00 investment.

237.    Moore agreed that MGO would repurchase the Mavars' equity ownership in MGO in exchange for their $400,000.00 investment.

238.    Plaintiffs have a valid and binding contract with Defendants under which MGO agreed to wire a total of $400,000.00 in funds to Plaintiffs in exchange for their three percent (3%) ownership interest in MGO.

239.    Defendants have altogether failed to perform under their agreement with Plaintiffs.

240.    Plaintiffs have not breached the agreement.

241.    Defendants are liable to Plaintiffs for breach of contract in the amount of at least $400,000.00.

## COUNT IX: PARTITION OF MGO

242.    Plaintiffs reincorporate herein by reference the allegations from paragraphs 1-241.

243.    MGO is a closely held corporate entity in which Defendants are shareholders and control MGO's operations.  MGO has few shareholders and is not publicly traded.

244.    Defendants purport that Plaintiffs own 4.2% of MGO.

245.    As such, Defendants owe fiduciary duties to Plaintiffs, who are minority, silent shareholders in MGO.

246.    Defendants owed a duty to act fairly toward Plaintiffs.

247.    Mississippi law requires Defendants to be intrinsically fair to Plaintiffs in their dealings regarding MGO.

248.    Defendants violated that fiduciary duty to Plaintiffs through their fraud, conversion, and theft of MGO funds.

249.    Defendants' breaches of their fiduciary duties have caused Plaintiffs harm in the amount of their investments in MGO as well as their ownership interest in MGO.

250.    The fiduciary duties incumbent to controlling shareholders and officers in a closely held company are the same duties present in a partnership.

251.    Defendants have effectively frozen Plaintiffs out of MGO through their fraud, deceit, mismanagement, waste, and failure to honor their promises of granting dividends and other financial rewards to Plaintiffs.

252.    Defendants' actions have been willful and wanton as directed at Plaintiffs.

253.    Defendants owe Plaintiffs in equity 4.2% of their purported valuation of MGO.

254.    On January 22, 2025, Hill projected that MGO would earn net revenue of $4,832,770.00 and experience operating expenses of approximately $786,730.00 in the fiscal year beginning June 1, 2025, and ending May 29, 2026.  For the fiscal year beginning June 5, 2026, and ending September 2, 2027, Hill projected net revenue of $9,112,500.00 and operating expenses of $2,173,500.00.

255.    The total projected profits for the next two fiscal years are $10,985,040.00.

256.    Plaintiffs are entitled to a partition of 4.2% of the valuation of MGO based on Defendants' projected profits.

257.    The Court should partition MGO to return to Plaintiffs the amount of their investment and all additional funds to be determined by a valuation of MGO based on Defendants' purported projected profits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Matthew C. Mavar and Julie D. Mavar pray for judgment as requested above against Defendants, including an award of damages consistent with this Complaint, treble damages, incidental and consequential damages, attorney's fees, costs of this lawsuit, and any other relief deemed appropriate by the Court.  Plaintiffs further request a jury trial on all issues so triable.

Respectfully submitted, this the 19th day of June, 2025.

**PLAINTIFFS MATTHEW C. MAVAR
and JULIE D. MAVAR**

BY: /s/ *Thomas L. Carpenter*
THOMAS L. CARPENTER

**OF COUNSEL:**

Thomas L. Carpenter (MB #9808)
WISE CARTER CHILD & CARAWAY, PA
2510 14th Street, Suite 1125
Gulfport, Mississippi 39501
Telephone: (228) 867-7141
Facsimile: (228) 867-7142
tlc@wisecarter.com

Jack F. Hall (MB #106482)
WISE CARTER CHILD & CARAWAY, PA
401 E. Capitol Street, Suite 600
Post Office Box 651
Jackson, Mississippi 39205
Telephone: (601) 968-5509
Facsimile: (601) 968-5519
jfh@wisecarter.com